THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HERSCHEL RORER, Defendant-Appellant.

Fifth District   No. 76-174

Opinion filed December 22, 1976.

E. Charles Geittmann and Terry J. Foster, both of Geittmann & Foster, of Metropolis, for appellant.

Dolores J. Johnson, State's Attorney, of Golconda, for the People.

Mr. JUSTICE GEORGE J. MORAN delivered the opinion of the court:

Defendant appeals from a judgment of the circuit court of Pope County wherein the trial court sitting without a jury found him guilty of the crime of voluntary manslaughter.

Defendant admits that the decedent Carl Worley was shot and killed by a bullet fired from a gun held by the defendant but contends: (1) that the shooting of Worley was accidental, and (2) that since there was some evidence of self-defense, the burden of proving the defendant guilty beyond a reasonable doubt as to that issue was upon the State, and the State did not sustain its burden.

The following witnesses testified on behalf of the State, namely: Clarence Cowsert, Jack T. Nolen, Charles Hicks and Ray Worley. The defendant took the stand in his own defense but called no other witnesses. Trula Rorer, the wife of the defendant, and Donna Worley, the wife of the decedent, witnessed the shooting in this case but neither was called to testify by the State nor by the defendant.

Clarence Cowsert testified that on August 18, 1975, he brought the deceased to the home of the defendant in Brownfield, Illinois. He was in Baker's Tavern in Elizabethtown, Illinois, when the decedent came in. He had not seen the decedent for more than a year. Decedent called him over to his table and bought him a beer and had one himself. The decedent then gave Cowsert $5 to take him to Brownfield. He let the decedent out at the Rorer home but he (Cowsert) did not go into the house.

When the decedent arrived at the home of the defendant, the defendant was in his house with Trula Rorer, his wife, Donna Worley, the wife of the decedent, Ray Worley, the 11-year-old son of the decedent, an 18-month-old child of the deceased, and several other children of the families. Shortly after he arrived, the decedent met his death from a bullet fired by a gun held by the defendant. It is undisputed that the gun was brought to the defendant's home by the wife of the decedent.

Jack T. Nolen, a detective with the Illinois State Police testified that he came to Pope County to help investigate a shooting incident that happened the day before. He testified that on August 21, 1975, he took a statement from the defendant which in pertinent part reads:

"I Herschel C. Rorer was at my home in Brownfield when Clarence Cowsert brought Carl Worley out to my house. Carl got out of the car, walked up in front of the house and stopped & called for Donna his wife who was there. His wife would not answer him because she was scared of him & then Carl Worley opened the door & came on in the house without knocking. He came in the

kitchen mad and the argument started. He ask Donna if she was going hime & she said no not after what you told me at the dairi barr Saturday. He told Carl Wayne Worley to go to the car, grabbed him & took him to the car. He came back in the house & told Donna if I don't get youns I have backing that will. He went out side grabbed the baby. Donna got the gun ran out the door holding it toward the sky he turned & came after her. She ran back into the house. He came in the door & said I am going to kill the baby go ahead & shoot. She threw the gun & I caught it & shot Carl Worley. Trula Rorer went to get the sheriff in Donna Worley's car. I was trying to protect Donna & the kids & my family."

He also testified that the defendant had made a prior statement which is as follows:

"August 18, 1975 3:50 p.m.

He [Carl Worley] came to my house and he said, He called for Donna and she wouldn't go out side so he came in house he tried to get her to go home. She said no I'm not going home because if I went home I know what would happen. You would beat the hell out of me like you have before. And so he said well I'm taking the kids. She said no, he grabbed up the baby. He went to the car with the baby and she picked up the gun and run at the door hollowing at him aiming the gun at him. He held the baby up in front of him to keep her from shooting. He knew she wouldn't shoot the baby. He turned to started up toward her. He was awful mad. And he got his knife and started threw doors about that time she fired. He dropped. I sent my wife Trula to town to get the sheriff. Sheriff got there we explained what happened and why it happened."

He was then asked if the defendant had made any comments to him regarding the statement of August 18. He answered:

"That incident had occurred exactly as he had stated before with the exception that he had pulled the trigger and they felt that it would go easier on Donna than it would him."

Charles Hicks, the sheriff of Pope County, Illinois testified that he was in his office on the day of this incident when a Pat McCormack and Trula Rorer came and informed him that something had happened at the Rorer residence. When counsel for defendant asked what Trula Rorer had told him, counsel for the State's objection was sustained. He testified that accompanied by a deputy sheriff he immediately went to the Rorer home and the first person he saw was Clarence Cowsert sitting in his car. He immediately went to the front of the Rorer home and found the deceased sitting in a slumped position in the doorway. When he picked up the deceased's left arm, the body slid down and lay flat on the porch floor.

The deceased had a knife in his right hand at the time. After he went into the house the defendant told him that Donna Worley had shot Carl Worley.

Ray Worley, the 11-year-old son of the decedent, testified in pertinent part as follows:

"Q: Did you see somebody fire a gun?

A: I saw the gun go off but I didn't see the trigger get pulled.

Q: All right, whose hand was the gun in when it went off?

A: Herschel's.

Q: And when you say Herschel, do you mean Herschel Rorer?

A: Yes.

* * *

Q: Did someone have the gun before Herschel had the gun?

A: Yes.

Q: And who was that?

A: My mom.

Q: And was that just before the shot occurred or just before the gun was discharged?

A: Yes, it was before the gun went off.

Q: How long had Herschel had the gun?

A: It had, when it first got in his hand that's when it went off.

Q: And when did he first get it into his hands?

A: When my mom gave it to him."

The defendant's testimony in pertinent part was as follows:

"Q: State your name.

A: Herschel Rorer.

Q: Are you the defendant in this case Mr. Rorer?

A: Yes.

Q: I would direct your attention to August 18th, 1975, and ask you if on that date you saw Carl Worley?

A: Yes.

Q: Where did you see him?

A: At my house.

Q: What was his condition on the last occasion you saw him?

A: He was dead.

Q: Were you present when he became deceased?

A: Yes.

Q: And could you briefly tell me the circumstances or events which resulted in his becoming deceased?

A: Donna Worley threw a gun and I caught it and it went off.

Q: As a result of a gun going off, what happened?

A: Carl Worley fell dead.

Q: Did the gun belong to you?

A: No sir.

Q: Did you in any way touch that gun before you caught it that day?

A: No sir.

Q: Are you right or left handed?

A: Right handed.

Q: Where in relation to yourself was Donna Worley standing at the time she threw the gun to you?

A: She was to my left slightly in front of me.

Q: When in point of time after you caught the gun, did the gun discharge?

A: Immediately.

Q: What if anything did you do which resulted in the gun discharging?

A: Just caught it."

In defendant's first statement made on August 18, the day of the shooting, he claimed that Donna Worley shot her husband. Three days later defendant admitted being in possession of the gun when it discharged. Defendant also said in the second statement that he was trying to protect and save Donna and the children and his own family. At trial defendant testified that the gun went off immediately when he caught it and that he did nothing to cause it to discharge other than to catch it. Ray Worley, the 11-year-old son of the decedent, verified this account by his testimony.

■■ Defendant argues that even if the evidence was sufficient to show that the shooting was an intentional act, his conduct was justified under section 7—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 7—1), which is set out below:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony."

The State maintains that since the defendant failed to raise the issue of self-defense in the trial court, it may not be raised for the first time on appeal. However, the issue of self-defense does not necessarily have to be raised by the defendant. " 'Affirmative defense' means that unless the State's evidence raises the issue involving the alleged defense, the defendant, to raise the issue, must present some evidence thereon." (Ill. Rev. Stat. 1975, ch. 38, par. 3—2(a).) Thus, when the State introduced

defendant's statement that he shot the decedent to save and protect the others, it was sufficient to raise the issue of self-defense or defense of others. Other evidence introduced by the State supports such a defense. For example, the State's evidence shows that Carl Worley was very angry and that he had threatened to kill the baby he was holding. In addition, there was testimony by investigating officers that an open pocketknife was found in Worley's right hand when they arrived on the scene. After introducing the evidence the State did not in any way rebut it.

■■ Once an affirmative defense is interposed by the introduction of some evidence by either the State or the defense, the burden of proving guilt beyond a reasonable doubt as to that issue, as well as all other necessary elements of the offense, is placed on the State. (*People v. Warren*, 33 Ill. 2d 168, 210 N.E.2d 507.) It is sufficient to acquit the defendant if his evidence on self-defense, together with all other evidence in the case, creates a reasonable doubt of guilt. (*People v. Williams*, 56 Ill. App. 2d 159, 205 N.E.2d 749.) Having introduced no evidence to rebut the defense of self-defense or defense of others, the State did not meet its burden of proof and the conviction must be reversed.

In *People v. Dawson*, 22 Ill. 2d 260, 174 N.E.2d 817, our Supreme Court stated:

> "The finding of the trial judge as to the credibility of the witnesses is entitled to great weight. However, we cannot, in every case, accept the trial judge's finding as conclusive, for the rule is that it is the duty of this court to examine the evidence in a criminal case and if it is so unsatisfactory and unreasonable as to raise a serious doubt of defendant's guilt, the conviction must be reversed. (People v. Williams, 414 Ill. 414; People v. Buchholz, 363 Ill. 270.) The burden is always upon the State to prove the defendant guilty beyond a reasonable doubt and a judgment of conviction can be sustained only on credible evidence which removes all reasonable doubt of defendant's guilt. Where the State's evidence is improbable, unconvincing and contrary to human experience, we have not hesitated to reverse the judgments of conviction." (22 Ill. 2d 260, 264-65.)

See also *People v. Davis*, 77 Ill. App. 2d 454, 222 N.E.2d 519.

■■ Where the evidence adduced at trial shows the killing of an approaching individual who brandishes a knife and threatens to kill a baby he holds in his arms, we think a serious doubt is raised as to the killer's criminal liability. Aside from the evidence relating to self-defense or to the defense of others, there was also sufficient evidence to support a theory of accidental homicide. Defendant testified that the gun went off at the instant he caught it, the discharge caused only by his act of catching the gun. The decedent's son also testified that the gun went off

immediately upon defendant's catching it and that he did not see the trigger pulled. This evidence raises a grave doubt as to whether the defendant did anything more to cause the gun to discharge other than to catch it. When questioned as to the plausibility of this theory, the sheriff who investigated the killing answered that the gun had not been tested to determine this possibility.

In view of all the evidence there remains a substantial doubt as to whether the defendant shot the decedent without legal justification or that the shooting was an intentional act.

Accordingly, the judgment of the circuit court of Pope County finding the defendant guilty of voluntary manslaughter is reversed.

Reversed.

CARTER, P. J., and JONES, J., concur.